UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                    :
LEO J. TARTAGLIA, SR.               :        3:17 CV 1315 (RMS)
                                    :
V.                                  :
                                    :
NANCY A. BERRYHILL,                 :
ACTING COMMISSIONER OF              :
SOCIAL SECURITY                     :        DATE: SEPTEMBER 28, 2018
                                    :
------------------------------------------------------ x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"]

denying the plaintiff Social Security Disability Insurance ["SSDI"] benefits.

I.       ADMINISTRATIVE PROCEEDINGS

On or about May 14, 2013, the plaintiff filed an application for SSDI benefits claiming that

he has been disabled since November 1, 2008, due to "back injury; neck injury; shoulder injury;

[and] knee injury." (Certified Transcript of Administrative Proceedings, dated September 27, 2017

["Tr."] 100; *see* Tr. 86–99, 100–12, 224). The Commissioner denied the plaintiff's application

initially and upon reconsideration. (Tr. 113–16, 118–20). On May 1, 2014, the plaintiff requested

a hearing before an Administrative Law Judge ["ALJ"] (Tr. 121–22), and on September 28, 2015,

a hearing was held before ALJ Matthew Kuperstein, at which the plaintiff and a vocational expert,

Michael Dorval,[1] testified. (Tr. 42–85; *see* Tr. 141–45, 147–51, 164, 273–81). On December 9,

---

[1] The ALJ and the plaintiff appeared in New Haven, Connecticut; the vocational expert appeared by telephone. (*See* Tr. 44, 164). The plaintiff had no objection to the qualifications of Dorval as a vocational expert. (Tr. 72).

2015, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 22–36). On January 27, 2016, the plaintiff requested review of the hearing decision (Tr. 176–78), and on June 5, 2017, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

On August 4, 2017, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on October 20, 2017, the defendant filed her answer and certified administrative transcript, dated September 27, 2017. (Doc. No. 10). On October 27, 2017, the parties consented to jurisdiction by a United States Magistrate Judge; the case was then transferred to Magistrate Judge Joan G. Margolis. (Doc. No. 15). On December 30, 2017, the plaintiff filed the pending Motion to Reverse the Decision of the Commissioner, with brief in support. (Doc. No. 18 ["Pl.'s Mem."]). On March 1, 2018, the defendant filed her Motion to affirm the decision of the Commissioner, with brief in support. (Doc. Nos. 25, 25-1 ["Def.'s Mem."]). On May 1, 2018, the case was transferred to this Magistrate Judge. (Doc. No. 26).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 18) is *denied*, and the defendant's Motion to Affirm (Doc. No. 25) is *granted*.

II.     FACTUAL BACKGROUND

At the time of his alleged onset date of disability, November 1, 2008, the plaintiff was forty-eight years old. (*See* Tr. 86). The plaintiff is married and has three children and three grandchildren. (Tr. 49–50). He lives with his spouse, his adult son, his daughter-in-law, and his adult daughter. (Tr. 51–52). The plaintiff has a twelfth grade education and has worked only in the construction industry since graduating from high school. (Tr. 194, 225; *see also* Pl.'s Mem. 9). At the time of the hearing, the plaintiff was fifty-five years old. (*See* Tr. 49). He has not

worked since his alleged onset date of disability; his date last insured is December 31, 2013. (Tr. 86–87, 224).

A.     <u>ACTIVITIES OF DAILY LIVING</u>

The plaintiff runs errands daily and is able to leave the house on his own and drive a car. (Tr. 52, 209, 235, 256, 259). If he drives for a long period of time, however, his legs begin to bother him. (Tr. 52; *see* Tr. 233). He goes grocery and clothes shopping, takes care of his mother, watches television every day, and manages his own finances. (Tr. 52, 210, 232, 236, 256, 260). Although the plaintiff's wife and children do almost all of the cooking, that is not a result of the plaintiff's injuries. (Tr. 63, 208). The plaintiff is able to do household chores such as taking out the garbage, vacuuming the floors, and laundering his clothes. (Tr. 212, 235, 259). He "tr[ies] to do anything, until [he] [has] to sit down or lay down." (Tr. 209). The plaintiff walks on a near-daily basis and can walk for about twenty to thirty minutes before he has to stop and rest. (Tr. 56, 212, 232, 236, 238, 262). The plaintiff testified that he can sit for about forty-five minutes to an hour before he needs to stand, but that he is "always moving." (Tr. 56; *see* Tr. 233, 236, 237, 257, 260). He also testified that he can stand for about twenty to thirty minutes before he has to sit back down again. (Tr. 56; *see* Tr. 233, 237, 257, 260). The plaintiff has had trouble sleeping due to pain and numbness in his back and legs. (Tr. 56, 207, 257).

Often, the plaintiff picks up his grandchildren from school and brings them to their soccer practice and games. (Tr. 50). He will play in the yard with his grandchildren, doing activities like throwing a football, for varying periods of time, depending on how he is feeling on the particular day. (Tr. 50; *see* Tr. 232). The plaintiff also attends church and other social groups, though not on a frequent basis. (Tr. 203, 237, 261). He volunteers at his church's annual bazaar, serving food to customers, which requires him to work for about one hour at a time. (Tr. 64). At the hearing,

the plaintiff testified that, since his alleged onset date of disability, he has traveled on at least three occasions to Florida, for a period of one week, during which he "sit[s] on the beach" and "hang[s] around the pool." (Tr. 59).

The plaintiff has had four knee surgeries since the 1980s and testified at the hearing that he has worn a knee brace for about five to six years. (Tr. 62, 212; *see* Tr. 238, 262). The plaintiff also explained that he no longer takes prescribed pain medication (*i.e.* Percocet) because he became addicted to the drugs. (Tr. 67–68, 208, 239). He testified that he "couldn't even get out of bed without taking a Percocet" and that he would "go to work and [he] would take one in the morning, one at noon, and one in the afternoon." (Tr. 68; *see also* Tr. 239). At the time of the hearing, however, the plaintiff had not taken prescribed pain medication for approximately five years. (Tr. 68; *see* Tr. 239).

B.     MEDICAL RECORDS[2]

1.     ORTHOPEDIC SPECIALTY GROUP

The record reflects the plaintiff's long and consistent treatment history with the Orthopedic Specialty Group ["OSG"]. Dr. Joel Malin evaluated the plaintiff in January 2005, when the plaintiff complained of longstanding knee pain. (Tr. 424). Dr. Malin's evaluation of the plaintiff at this time revealed that the affected knee had a mild effusion, but that the range of motion of the knee was full extension to 110 degrees. (Tr. 424). Dr. Malin ordered an MRI of the knee, which showed a degenerative change with a meniscal tear both medially and laterally. (Tr. 423). On January 20, 2005, Dr. Malin noted that the plaintiff was "markedly symptomatic especially on start up or with activity" and opined that an arthroscopy and debridement would be reasonable. (Tr. 423). The plaintiff underwent a right knee arthroscopy on March 7, 2005. (Tr. 421). The plaintiff

---

[2] Commonly used medical terms do not appear in quotation marks although the terms are taken directly from the plaintiff's medical records.

recovered well from the arthroscopy and returned to work approximately one month later. (Tr. 419). On June 2, 2005, Dr. Malin noted that motion of the knee was full extension and that there was no evidence of effusion. (Tr. 417).

The plaintiff first complained of back pain in June 2005 and noted that he was unable to work as effectively as he had in the past. (Tr. 417). An examination revealed "band-like back pain with left-sided spasm" and a positive straight leg test on the left side. (Tr. 417). On August 22, 2005, the plaintiff saw Dr. Lawrence Kirschenbaum for a pain management consultation for lower back pain. (Tr. 413). Though a physical examination was relatively unremarkable, an MRI showed degenerative disc disease and disc bulging at the L5-S1 region of the spine. (Tr. 413). Dr. Kirschenbaum scheduled the plaintiff to undergo a "left-sided L5-S1 intralaminar epidural steroid injection under fluoroscopy," referred him for physical therapy, and encouraged him to develop a regular home exercise program following completion of physical therapy. (Tr. 414). In October 2005, Dr. Kirschenbaum scheduled the plaintiff for a "left L4-L5 and L5-S1 intra-articular facet block," following which the plaintiff reported fifty percent improvement.[3] (Tr. 410).

In April 2006, the plaintiff complained of pain in his left knee for the first time, which he said came on suddenly. (Tr. 404). An MRI of his left knee revealed a "posterior horn medial meniscal tear and a parameniscal cyst near the intercondylar notch." (Tr. 400). On December 5, 2006,[4] the plaintiff underwent a left knee arthroplasty (Tr. 386), from which he recovered with "excellent result." (Tr. 384).

---

[3] In December 2005, the plaintiff and Dr. Kirschenbaum decided that the plaintiff would continue exercising on a regular basis and working full time. (Tr. 410). In February 2006, however, the plaintiff noted that he suffered an exacerbation of his usual pain and was subsequently scheduled to undergo a "left L3-4 and L5 facet joint nerve block under fluoroscopy." (Tr. 409). Following the nerve block, the plaintiff reported only one day of relief. (Tr. 408). After a second nerve block, however, the plaintiff reported a few days of over eighty-percent relief. (Tr. 405).

[4] The plaintiff complained of pain in his left knee continuously between April and December 2006; however, he did not have surgery until December 2006 because he did not "have time to consider surgery given the large amount of jobs he ha[d] lined up in a concrete business." (Tr. 400).

In June 2006, the plaintiff explained that, although he had been feeling well after a radiofrequency lesioning, severe pain in his back had resumed after he lifted the tailgate of his truck and reached into the truck to lift a light object. (Tr. 399). On physical examination, however, strength and sensory testing of the plaintiff's lower extremity was normal and the straight leg raising test was negative bilaterally. (Tr. 400). A review of an MRI showed a "small left lateral dis[c] protrusion at L5-S1 contained by the posterior longitudinal ligament." (Tr. 397). Dr. Kirschenbaum noted that the disc protrusion was displacing the left S1 nerve root, which may have caused the plaintiff's radicular pain. (Tr. 397). On June 22, 2006, the plaintiff complained of significant pain and instability in his right knee following an incident during which scaffolding gave way and came down on his left leg, and his right leg "flexed into a deep flexed position and developed anterior compression over the patellofemoral joint as he landed." (Tr. 396). Dr. Malin gave the plaintiff a range of motion brace in order to prevent any hyperflexion injury. (Tr. 396). On July 6, 2006, Dr. Malin noted that the brace and anti-inflammatory medication "were quite effective" and that the plaintiff was ambulating independently and comfortably, without limp. (Tr. 395). Also in July 2006, the plaintiff reported that he had been doing less work as a laborer and felt that the decrease in physical activity contributed to his increased relief from back and leg pain. (Tr. 394).

On September 11, 2006, Dr. Robert Dawe evaluated the plaintiff. (Tr. 391). Dr. Dawe noted that the plaintiff was "tender about the lower back" and "ha[d] pain with forward flexion." (Tr. 391). He noted also that the plaintiff had "some pain with hyperextension and side bending," but that "[n]eurologically, he has full motor tone, power and strength throughout." (Tr. 391). Dr. Dawe opined that the plaintiff "has a definite progressive neuromotion segment failure at L5-S1." (Tr. 391). The plaintiff and Dr. Dawe also discussed surgical intervention (Tr. 391); however, on

January 11, 2007, Dr. Kirschenbaum noted that the plaintiff was not willing to pursue any surgical options at that time. (Tr. 383).

In January 2008, the plaintiff returned to Dr. Kirschenbaum and complained of left-side, lower back pain. (Tr. 371). On physical examination, there was no spasm or trigger points, and the straight leg test was negative bilaterally. (Tr. 371). Moreover, "a sensory and motor examination of the lower extremity was intact." (Tr. 371).

On March 10, 2008, the plaintiff consulted with Dr. Dawe to discuss increasing numbness and tingling in his legs, which limited his ability to sleep. (Tr. 369). Dr. Dawe noted global tenderness in the translumbar region at L4-5 and L5-S1, and some pain over the right buttock area. (Tr. 369). However, the pain did not radiate into the plaintiff's leg, and he had full motor, tone, power, and strength about his lower extremities. (Tr. 369). Dr. Dawe discussed with the plaintiff multiple procedures to remedy the back pain. (Tr. 369). Over the following months, the plaintiff continued to see Dr. Kirschenbaum and complain of moderate and, at times, severe, lower back pain. (*See* Tr. 362–68). On August 11, 2008, Dr. Kirschenbaum sent the plaintiff back to Dr. Dawe after the plaintiff indicated that he wanted to pursue surgical options for his lower back pain. (Tr. 361). The plaintiff did not immediately see Dr. Dawe to discuss the surgical options, as the plaintiff wanted to wait until his work schedule was not as busy. (Tr. 359).

On September 18, 2008, the plaintiff met with Dr. Dawe to discuss surgical options for his back and leg pain. (Tr. 358). He explained to Dr. Dawe that the pain was progressively more severe and debilitating to him and that it inhibited his daily activity and restricted his ability to work. (Tr. 358). On physical examination, Dr. Dawe noted that the plaintiff remained tender about the lower back and had pain with forward flexion, sitting for any period of time, and side bending. (Tr. 358). A sensory examination revealed radicular pain into the right leg, consistent

with an "L-5 root level"; a neuro examination, however, revealed full motor, tone, and power. (Tr. 358). The plaintiff was able to walk on his heels and toes. (Tr. 358). Dr. Dawe recommended an updated MRI[5] and discussed multiple procedures that he thought would relieve the plaintiff's pain. (Tr. 358). Dr. Dawe also noted that, in his view, the plaintiff was no longer capable of functioning as a mason. (Tr. 358).

On October 30, 2008, which was the plaintiff's last visit to OSG before his alleged onset date of November 1, 2008, the plaintiff saw Dr. Dawe again and complained of back and leg pain that limited his daily activities. (Tr. 356). The plaintiff explained that he felt as though he was unable to continue his work as a mason. A physical examination revealed that the plaintiff exhibited no paravertebral spasm or listing, but had pain and tenderness to direct palpation on the "midline of his lumbar spine at about the L4-5 and L5-S1 level." (Tr. 356). The plaintiff had slight pain with forward flexion and mild pain radiating to both upper buttocks with hyperextension. (Tr. 356). A sensory examination was unremarkable, and the plaintiff was able to walk on his heels and toes. (Tr. 356).

In April 2009, an examination of the plaintiff revealed that he had tenderness in the translumbar area, pain on forward flexion, and mild pain with hyperextension and side bending. (Tr. 349). He also had pain radiating into both buttocks, which was "consistent with an L5 root level." (Tr. 349). Dr. Dawe noted that the plaintiff "was clearly aware" of the available treatment, and the two again discussed the surgical options available. (Tr. 349). A February 2010 examination of the plaintiff revealed the same findings, and Dr. Dawe detailed again the procedures available to the plaintiff. (Tr. 345).

---

[5] This MRI revealed a "diffuse disc bulge" and "disc desiccation changes" at the L5-S1 level, as well as "a broad-based lateral disc protrusion on the left." (Tr. 324). The record noted, however, that this was unchanged from the plaintiff's prior MRI in 2006 and was not causing significant canal stenosis or narrowing of the remainder of the intervertebral disc space levels. (Tr. 324).

On February 11, 2011, the plaintiff was involved in a motor vehicle accident, during which another vehicle rear-ended his vehicle. (*See* Tr. 440–41). Following the car accident, the plaintiff began complaining of, *inter alia*, chronic neck pain.[6] (*See* Tr. 443; *see also* Tr. 938). On February 6, 2014, following complaints of three years of persistent neck pain, the plaintiff underwent an MRI that showed a "[l]arge left-sided C5-6 dis[c] herniation" and a "[s]mall left paracentral dis[c] herniation at C6-7." (Tr. 939). The MRI report also noted, *inter alia*, that cerebrospinal fluid, both anterior and posterior, was seen at all levels, which is not consistent with a diagnosis of spinal stenosis, and that, at C6-7, there was "a moderate chronic left paracentral disc herniation without cord or nerve root compression." (Tr. 938). The plaintiff underwent a CT scan on March 13, 2014, which revealed moderate to marked left foraminal narrowing at the C5-6, C6-7, and C7-T1 regions, as well as a calcified disc herniation at C5-6 and a partially calcified disc herniation/spondylotic ridging at C6-7. (Tr. 936–37).

On March 11, 2014, at the request of Dr. Dawe, the plaintiff saw Dr. Perry Shear. (Tr. 919). The plaintiff explained to Dr. Shear that, despite the chiropractic treatment he was receiving for his neck and back pain, his symptoms continued to worsen over time. (Tr. 919). On examination, Dr. Shear noted "marked decreased rotation of the head to the left side," normal range of motion of the head to the right side, "slight decreased extension of the cervical spine," normal flexion, and normal range of motion in both shoulders. (Tr. 920). A motor examination revealed normal power in all extremities. (Tr. 920). Dr. Shear's review of the plaintiff's MRI from February 6, 2014 showed left C6 nerve root impingement, but no spinal cord or nerve root compression at C4-5. (Tr. 920). Also in March, 2014, Dr. Michael Saffir diagnosed the plaintiff with left arm dyesthesia with evidence of carpal tunnel syndrome and mild left cubital tunnel

---

[6] Following the car accident, the plaintiff sought treatment primarily at the Integrated Medical Centers ["IMC"], and those records are discussed in section II.B.2, *infra*.

syndrome, but found no radiculopathy along the left arm despite the cervical spondylosis and narrowing shown on the imaging studies. (Tr. 917–18). Dr. Saffir added that an examination of the plaintiff's left arm showed "no acute or chronic degeneration and normal motor unit recruitment" and that "no neuropathic changes or radiculopathy [were] evident." (Tr. 917–18). On April 1, 2014, Dr. Dawe noted that the plaintiff was suffering from a "double crush effect."[7] (Tr. 906).

On April 21, 2014, Dr. Dawe and Dr. Shear performed an anterior interbody fusion on the plaintiff at C5-7, which included the use of iliac bone grafting. (Tr. 928). The plaintiff tolerated the procedure well and did not experience any complications. (Tr. 931). Following the surgery, the plaintiff obtained good motion in the cervical region; Dr. Dawe's notes from August 29, 2014 reflect that the plaintiff was able to start playing "some light golf." (Tr. 899; *see also* Tr. 1015, 1029).

Dr. Saffir saw the plaintiff on October 2, 2014, and noted that the plaintiff had "mild guarding with resisted right lower extremity range of motion," but that the plaintiff did not feel a Toradol injection was necessary because he was "managing somewhat better." (Tr. 1034). On October 6, 2014, the plaintiff underwent an MRI of the lumbar spine. (Tr. 1037). The MRI showed degenerative changes; however, there was no associated central canal stenosis or nerve root compression. (Tr. 1011, 1038). An electromyography report of both legs, dated February 18, 2015, showed "no acute or chronic degeneration," as well as "normal unit recruitment with no neuropathic changes or radiculopathy evident." (Tr. 1020). Dr. Saffir noted that the leg studies were "benign." (Tr. 1020). A February 18, 2015 examination of the plaintiff showed "motor

---

[7] "Double crush syndrome" is used to describe "a clinical entity of multiple sites of compression along a single peripheral nerve." Patrick M. Kane, et al., *Double Crush Syndrome*, 23 J. AM. ACAD. ORTHO. SURGEONS 558, 558 (2015).

strength testing with fair strength within functional limits." (Tr. 1017). On March 19, 2015, Dr. Kirschenbaum found that the plaintiff's "[r]ecent nerve conduction studies were unrevealing" and that "[a]n MRI showed degenerative changes at L4-L5 and L5-S1 with both left and right foraminal narrowing with no obvious nerve impingement." (Tr. 1016). A physical examination of the plaintiff on the same date showed "no spasm or trigger points in the lumbar/buttock region." (Tr. 1016). A sensory motor examination of the plaintiff's lower extremity was intact. (Tr. 1016). On March 27, 2015, the plaintiff underwent an epidural steroid injection in the lumbar region (Tr. 1036), and on June 30, 2015, the plaintiff underwent a left L4-5 and left L5-S1 facet joint block to relieve the pain in his lower back (Tr. 1035).

### 2.    INTEGRATED MEDICAL CENTERS

The record reflects also the plaintiff's extensive treatment history with the Integrated Medical Centers ["IMC"], at which he saw primarily chiropractor Jeffrey Walczyk, D.C. (*See* Tr. 433–877, 879–98). On October 13, 2009, the plaintiff complained of pain and discomfort over the left and right lower back, with pain radiating toward the left buttock. (Tr. 710). The plaintiff explained that the injury was caused by twisting and described the pain as a constant "aching feeling, sharp pain, stiffness, tingling feeling." (Tr. 710). Following treatment, Dr. Walczyk diagnosed the plaintiff with myalgia and myositis (not otherwise specified), lumbago, sacroiliitis (not elsewhere classified), and skin sensation disturbance (Tr. 710); and on October 19, 2009, he added the diagnosis of pain in the thoracic spine. (Tr. 711).

On April 9, 2010, the plaintiff saw Dr. Walczyk and complained of pain and discomfort in the mid-back; he described his back as stiff and the pain as frequently occurring. (Tr. 718). He also complained of lower back pain that radiated toward the right anterior thigh and right posterior upper thigh. (Tr. 719). The plaintiff explained that the pain in his lower back was constant and

rated it as moderate to severe in nature. (Tr. 719). He also complained of pain and discomfort over the right buttock, which he stated was frequently occurring. (Tr. 719). On physical examination, the thoracic region was normal, and there were no active or passive range of motion limitations. (Tr. 718). Dr. Walczyk noted tenderness on palpation over the T11 and T12 regions, and palpable tight muscle bands on examination of the thoracic paraspinal muscles on both sides. (Tr. 718). On examination of the lumbar region, Dr. Walczyk noted an abnormal gait, as well as that passive range of motion was restricted in flexion. (Tr. 718). Dr. Walczyk noted also that there was tenderness on palpation over the left and right sacroiliac joint and bilateral paraspinous muscles, and that examination of the lumbar paraspinal muscles revealed palpable tight muscle bands. (Tr. 718). A physical examination of the plaintiff's hips on June 9, 2010 revealed passive range of motion restriction in both hips on adduction. (Tr. 728). There were also active trigger points on examination of the gluteus medius muscle, and both hips had capsular tightness and were tender on palpation. (Tr. 728).

On June 16, 2010, the plaintiff completed a "Back Index" form, on which he rated how his back pain affected his everyday life. (Tr. 701). The plaintiff noted that his pain comes and goes and is very severe; his normal sleep is reduced by less than twenty-five percent; he cannot sit for more than one hour because of the pain; he cannot stand for more than ten minutes without increased pain; he cannot walk more than one-quarter mile without pain; bathing and dressing cause pain, and he finds it necessary to alternate ways of doing them; he can only lift light weights; he has pain while traveling, but it does not require him to seek alternate forms of travel; the pain has no significant effect on his social activities, but he cannot do "energetic activities"; and the pain is gradually worsening. (Tr. 701).

On August 16, 2010, Dr. Stephen Rosenman examined the plaintiff, whose primary complaint at the time was hip pain. (Tr. 732). The plaintiff explained that the pain occurred after he lifted a child and heavy boxes, and after he bent over. (Tr. 732). The plaintiff described the pain as cramping, gripping, and spasmodic. (Tr.732). He stated that the pain was constant and severe, rating as a nine out of ten, with zero being no pain and ten being the worst pain possible. (Tr. 732). A physical examination of the plaintiff showed tenderness on palpation and the following passive range of motion restrictions: flexion; extension; abduction; adduction; internal rotation; and external rotation. (Tr. 732). Dr. Rosenman noted that the pain affected the plaintiff's daily activities. (Tr. 733). He remarked specifically that pain prevented the plaintiff from walking short distances and that the plaintiff felt that he could accomplish only very light activity for a duration of two minutes. (Tr. 733). Additionally, he stated that the plaintiff's sitting tolerance was limited, as the plaintiff could sit for less than fifteen minutes before he had to stand up, walk, or lay down. (Tr. 733). His notes also reflect that the plaintiff could stand or walk only for fifteen to thirty minutes before he had to change position, and that the plaintiff reported three to five hours of sleeplessness each night because of the pain. (Tr. 733).

On October 18, 2010, Dr. Rosenman examined the plaintiff again for right hip pain. (Tr. 744). The plaintiff described the pain as gripping, shooting, constant and severe, and rated it as a ten out of ten. (Tr. 744). On examination, Dr. Roesenman noted that there was no swelling, erythema, atrophy, or deformity. (Tr. 745). He also observed a normal range of motion; however, there was pain with any movement. (Tr. 745). Dr. Rosenman opined that the plaintiff's overall prognosis was "fair" and that the plaintiff's probability of near complete relief was low. (Tr. 745). He also noted the following impact on the plaintiff's daily activities: the plaintiff was prevented from walking short distances; he could not engage in very light activity even for two minutes; he

could climb stairs only with great difficulty; he could barely tolerate standing or walking and had to change position by sitting or lying down after fifteen minutes; he had difficulty kneeling, bending, and squatting; he experienced two to three hours of sleeplessness each night; and he was depressed because of the chronic pain. (Tr. 745).

On January 5, 2011, the plaintiff saw Dr. Rosenman again and complained of pain in his lumbar region and right hip. (Tr. 760). The plaintiff described his lumbar pain as "sharp pain, spasm, and stiffness" and stated that the pain was frequent and moderate in nature; he rated it as six out of ten. (Tr. 760).

On physical examination, Dr. Rosenman noted that inspection of the lumbar region was normal, but that active range of motion was restricted in flexion, extension, left and right rotation, and left and right lateral flexion. (Tr. 760). He also observed tenderness on palpation over L4, L5, and S2, and that pain radiated to the right hip. (Tr. 760). On examination of the plaintiff's right hip, Dr. Rosenman noted that inspection was normal, but that there was tenderness on palpation. (Tr. 760). As to the plaintiff's daily activities, his personal self-care was not limited, and he could perform such activities normally; he could lift only very light objects; he could not engage in even very light activity for two minutes; pain prevented him from walking short distances; he could barely tolerate standing or walking had to change position by sitting or lying down within fifteen minutes; he had difficulty kneeling, bending, and squatting; and he could not participate in recreational activity. (Tr. 761). A chiropractic note from that day indicated that the plaintiff's lower back and hip pain had subsided slightly, but that it had increased following a change in weather.[8] (Tr. 762). On January 24, 2011, Dr. Rosenman's notes indicate that there

---

[8] The progress notes from January 5, 2011 reflect that the plaintiff had not been doing the at-home exercises and stretches as often as he should. (Tr. 855).

were no passive or active range of motion restrictions in the lumbar spine; however, there was pain during all active range of motion movements. (Tr. 765).

Immediately following the plaintiff's motor vehicle accident on February 11, 2011, he reported to IMC that he was experiencing arm/shoulder pain, back pain and stiffness, headaches, and neck pain and stiffness. (Tr. 443). He rated the neck pain as a three out of ten. (Tr. 856). He described the pain as aching, stiffness, throbbing, burning, and tingling. (Tr. 443). He also indicated that the pain occurred every day and interfered with his work, sleep, daily routine, and recreation; he added that it was painful to sit, stand, walk, bend, and lay down. (Tr. 443). Multiple ultrasonographic images taken following the accident, which Dr. John Donahue reviewed, showed no evidence of a subcutaneous edema and no evidence of fluid collection or mass. (Tr. 468). Another examination, which Dr. Gioia Riccio performed immediately after the accident, revealed a mild degenerative change at the C5-6 and C6-7 levels with disc space loss; however, there was "no definitive instability appreciated on flexion and extension." (Tr. 469). Other records from immediately after the accident indicate that the plaintiff complained of mild pain and discomfort in his neck, and rated the pain at a three to four out of ten. (Tr. 472).

The plaintiff also saw Dr. Rosenman within days of the accident. (Tr. 506). At this visit, the plaintiff complained of intermittent neck pain, which he described as "aching feeling, dull pain, numbness, spasm, and stiffness," and rated at a three out of ten. (Tr. 506). An examination of the active range of motion of the plaintiff's cervical spine revealed restricted extension, flexion, left and right rotation, and left and right lateral flexion. (Tr. 506). It also showed tenderness on palpation over the C5 and C6 region, as well as pain radiating to the bilateral occipital head. (Tr. 506). Dr. Rosenman opined that the plaintiff's probability of near complete relief was high. Dr. Rosenman recorded the following diagnoses: sprains and strains of the lumbar region; pain in the

joint of the pelvic region and thigh; pain in the thoracic spine; and sprains and strains of the neck. (Tr. 507). The plaintiff also saw Dr. Walczyk within days of the accident. (Tr. 508). Dr. Walczyk's examination of the plaintiff's thoracic region revealed abnormal posture, as well as tenderness on palpation over the T1-5 region and tenderness in the rhomboid major muscles on both sides. (Tr. 508). Dr. Walczyk's examination of the plaintiff's lumbar region revealed, *inter alia*, tenderness on palpation over the L4, L5, right sacroiliac joint, and bilateral paraspinous muslces, as well as a positive iliac compression test on the right. (Tr. 509). Dr. Walczyk's examination of the plaintiff's hip revealed tenderness on palpation over the trochanteric bursa, capsular tightness in the right hip, and active trigger points and palpable tight muscle bands in the gluteus medius muscle on the right side. (Tr. 509). However, there was no decrease in the passive range of motion of the right hip. (Tr. 509). Over the months that followed, the plaintiff continued to receive, on a near-weekly basis, chiropractic treatment and physical therapy at IMC for the pain he was experiencing in his neck, thoracic region, lumbar region, and hip.[9] (*See* Tr. 513–611). The plaintiff was prescribed Naprosyn to take for pain relief. (Tr. 514).

On February 19, 2011, the plaintiff saw Dr. Rosenman, and complained of pain and discomfort in the left shoulder, which radiated toward the left hand. (Tr. 519). The plaintiff explained that he began experiencing the shoulder pain following the motor vehicle accident. (Tr.

_____

[9] A report dated January 16, 2012 detailed the plaintiff's final medical evaluation. (*See* Tr. 435). The report concluded that "the combined values for both the cervical and lumbar spine equal a whole person impairment rating of 19%." (Tr. 436). The final diagnoses were as follows: (1) cervical sprain/strain; (2) cervical radiculopathy; (3) lumbar sprain/strain; and (4) lumbar disc herniation. (Tr. 436). The report also concluded that the plaintiff

> will require periodic physical medicine treatments involving mobilizations, and soft tissue releases at a frequency of one to two times per month at approximately $300 a visit, to maintain a normal lifestyle. . . . If Mr. Tartaglia continues to follow in his pattern of recovery and suffering where he continues to experience chronic pain and flare ups, the cost of his healthcare over the remainder of his lifespan will range from $100,800.00 to $201,600.00. Also, should Mr. Tartaglia opt to seek surgical intervention for both his lumbar and cervical spine, the additional cost of his healthcare could range from $50,000.00 to $85,000.00 including physical therapy.

(Tr. 437).

519).  A physical examination of the shoulder revealed that there were no active or passive range of motion limitations or restrictions; however, there was tenderness on palpation over the anterior and posterior aspect, as well as on the trapezius muscle.  (Tr. 519).  With regard to the plaintiff's shoulder, Dr. Rosenman diagnosed him with pain in the joint of the shoulder, pain in the joint of the upper arm, and rotator cuff sprains and strains.  (Tr. 519).  Dr. Rosenman opined that there was a probability of some relief for the plaintiff.  (Tr. 520).

On March 25, 2011, the plaintiff completed another "Back Index."  (Tr. 486).  The plaintiff noted the following: his pain comes and goes and is moderate; his normal sleep is reduced by less than twenty-five percent; pain prevents him from sitting for more than one hour; he cannot stand longer than one hour without increasing pain; he cannot walk more than one-quarter mile without increasing pain; washing and dressing increases pain and he finds it necessary to change the way he does them; he can lift only very light weights; he gets extra pain while traveling, but it does not cause him to seek alternate forms of travel; and the pain is gradually worsening.  (Tr. 486).  He completed a similar form related to his neck pain on the same date, on which he noted the following: his pain is very mild at the moment; his sleep is mildly disturbed, with one to two hours of sleeplessness each night; he cannot read as much as he wants because of moderate neck pain; he can concentrate fully when he wants to with slight difficulty; he cannot do his usual work; he can look after himself normally, but it causes extra pain; he can lift heavy weights, but it causes extra pain; and he has no headaches at all.  (Tr. 487).  On March 29, 2011, the plaintiff completed a questionnaire titled "Disabilities of the arm, shoulder, and hand," which asked the plaintiff how the pain in his arms, shoulders, and hands affected his daily activities.  (Tr. 489).  He noted that the pain was moderate and slightly interfered with his social activities, caused him to feel moderately limited in his work and daily activities, and caused moderate difficulty sleeping.  (Tr.

489). He also noted that the tingling in his arm, shoulder, and hand was severe, weakness was moderate, and stiffness was mild; however, he did not agree or disagree with the statement that the pain in his arm, shoulder, and hand made him feel less capable, confident, or useful. (Tr. 489).

Dr. Rosenman's November 7, 2011 examination of the plaintiff revealed that the passive range of motion in the lumbar spine was restricted in flexion, extension, left and right rotation, and left and right lateral flexion. (Tr. 583). The record reflects also that there was tenderness on palpation over the L4, L5, and S1 regions and that the pain radiated to the right calf. (Tr. 583). Dr. Rosenman opined that the plaintiff was "[c]urrently observing maximum medical improvement" and that the plaintiff's probability of near complete relief was low. (Tr. 584). On January 16, 2012, Dr. Rosenman evaluated the plaintiff again, which revealed that the plaintiff's active range of motion in the cervical spine was restricted in flexion, left and right rotation, and left lateral flexion. (Tr. 606). There was tenderness on palpation over the C6 and C7 regions; however, the pain did not radiate. (Tr. 606). The examination of the plaintiff's lumbar region revealed that the plaintiff's active range of motion was restricted in flexion, left rotation, and left lateral flexion. (Tr. 606). The examination of the plaintiff's left shoulder revealed that the plaintiff's passive range of motion was restricted in forward flexion. (Tr. 606). The examination of the shoulder, however, showed "[n]o contusion, bruising, deformity of AC joint, psuedosubluxation or erythema . . . ." (Tr. 606). There was tenderness on palpation of the left shoulder at the anterior aspect, lateral aspect, posterior aspect, and rotator cuff. (Tr. 606). Finally, Dr. Rosenman noted that pain from the left shoulder radiated to the left hand and wrist. (Tr. 606). Dr. Rosenman opined that the plaintiff's overall prognosis was poor and that his probability of some relief was low. (Tr. 607).

On April 2, 2012, the plaintiff informed Dr. Walczyk that the pain in his lumbar region was exacerbated when he tried to mow the lawn using a riding lawn mower. (Tr. 780). Dr. Walczyk's examination of the plaintiff's lumbar region revealed passive range of motion restrictions in flexion, extension, and right rotation. (Tr. 779). Additionally, there was tenderness on palpation over the L5 and S1 regions, as well as the right sacroiliac joint and right paraspinous muscles. (Tr. 779). Dr. Walczyk noted also that pain from the plaintiff's lumbar region radiated to his right foot. (Tr. 780). Examination of the qudratus lumborum muscles on the right side revealed hypertonia, moderate tenderness, active trigger points, and palpable tight muscle bands; examination of the paraspinal muscles on the right side revealed moderate tenderness, active trigger points, and palpable tight muscle bands. (Tr. 780).

On June 8, 2012, Dr. Walczyk examined the plaintiff's right knee, which revealed "balloting of the patella" and active range of motion restrictions in extension and flexion. (Tr. 786). The plaintiff explained that he injured his knee while twisting and rated the pain at an eight out of ten. (Tr. 787). On July 16, 2012, Dr. Shari Weisenfeld evaluated the plaintiff, who maintained his complaints about neck, back, and knee pain. (Tr. 792). Dr. Weisenfeld's examination of the plaintiff's neck revealed decreased range of motion due to pain and/or spasm. (Tr. 792) Her examination of the plaintiff's lumbar spine revealed that active range of motion was restricted in flexion, extension, and left and right lateral flexion. (Tr. 792). Her examination of the plaintiff's right knee showed minimal crepitus and mild effusion. (Tr. 792). Dr. Weisenfeld's neurologic evaluation revealed normal findings. (Tr. 793). On August 6, 2012, Dr. Weisenfeld prescribed Flexeril to the plaintiff. (Tr. 796).

On August 25, 2012, the plaintiff rated his neck pain as a nine out of ten. (Tr. 803). On September 12, 2012, he rated his neck pain at a five out of ten. (Tr. 806). Also, on September 12,

2012, for the first time, the plaintiff complained of bicep, elbow, tricep, and forearm pain. (Tr. 810–11.) He described the pain as "aching feeling, numbness and stiffness," and stated that discomfort was moderate in nature. (Tr. 810–11). The plaintiff's complaints of pain in his bicep, elbow, tricep, and forearm do not appear again in his medical records.

On January 2, 2013, Dr. Weisenfeld noted that the plaintiff complained of neck pain and lumbar pain, which he rated at a three out of ten and five out of ten, respectively. (Tr. 820–21). Electromyography testing in both regions revealed no consistent nerve deficit findings. (Tr. 820). An orthopedic examination of the plaintiff's lumbar spine was normal; however, Dr. Weisenfeld noted positive Phalen's and Tinnel testing in the left wrist, which is indicative of carpal tunnel syndrome. (Tr. 820). A neurologic examination was normal. (Tr. 821). The plaintiff continued to complain of neck, back, shoulder, hip, and knee pain over the months that followed. (Tr. 822–847).

On September 13, 2013, the plaintiff completed another "back index" form. (Tr. 879). The plaintiff noted the following about his back pain: the pain comes and goes and is severe; the pain reduces his normal sleep by less than fifty percent; the pain prevents him from sitting for more than one hour; he cannot stand for longer than thirty minutes without increasing pain; he cannot walk more than one-half mile without increasing pain; washing and dressing increase pain, and he finds it necessary to change his way of doing them; he can only lift very light weights; traveling increases pain, but he does not find it necessary to seek alternate forms of travel; his social life is normal, but increases the degree of pain; and the pain is gradually worsening. (Tr. 879). On a "neck index" completed the same day, the plaintiff noted the following about his neck pain: the pain comes and goes and is moderate; the pain mildly disturbs his sleep, causing one to two hours of sleeplessness each night; the pain prevents him from reading as much as he wants; he can

concentrate fully, but with slight difficulty; he cannot do his usual work; he can look after himself normally, but it causes extra pain; he can only lift very light weights; he cannot drive his car for as long as he wants; he can only engage in a few of his usual recreation activities; and he has slight headaches that come infrequently. (Tr. 880).

On December 6, 2013,[10] Dr. Walczyk provided chiropractic treatment to the plaintiff, who continued to complain of neck, back, shoulder, and hip pain. (Tr. 1002–03). Dr. Walczyk noted moderate impairment in the neck, lumbar spine, and left shoulder. (Tr. 1002–03). Dr. Walczyk noted the following about the plaintiff's daily activities: his sitting tolerance was limited, as he could sit for only fifteen to thirty minutes before needing to stand, walk, or lay down; reaching and grasping items overhead posed great difficulty; he had prohibitive difficulty with forceful activities with his arms; he experienced sleep disturbance, with three to five hours of sleeplessness each night; he experienced moderate pain most of the time; and the pain interfered with his recreational activities most of the time. (Tr. 1003). Dr. Walczyk diagnosed the plaintiff with myalgia and myositis (not otherwise specified), lumbago, sacroiliitis (not elsewhere classified), skin sensation disturbance, localized osteoarthritis (not otherwise specified) of the lower leg, pain in the joint of the pelvic region and thigh, pain in the thoracic spine, thoracic or lumbosacral neuritis or radiculitis (not otherwise specified), abnormality of gait, sprains and strains of the shoulder and upper arm (not otherwise specified), sprains and strains the of knee and leg (not otherwise specified), and sprains and strains of the lumbar region. (Tr. 1003).

On February 6, 2014, the plaintiff underwent an MRI on his cervical spine, which was compared to an MRI from May 2011. (Tr. 1013). The MRI revealed, *inter alia*, "[l]arge left-sided

---

[10] This was the plaintiff's final visit to IMC before his date last insured of December 31, 2013.

C5-6 disc herniation," which "sharply impinges on the left C6 nerve root exit and causes the cord

to be displaced slightly posteriorly and rotated towards the right." (Tr. 1013).[11]

## III.   THE ALJ'S DECISION

Following the five step evaluation process,[12] the ALJ found that the plaintiff's date last

insured was December 31, 2013 (Tr. 27, 46), and that the plaintiff had not engaged in substantial

gainful activity since the alleged onset date of November 1, 2008. (Tr. 27, citing 20 C.F.R.

§ 404.1571 *et seq*.). The ALJ concluded that, as of the date last insured, the plaintiff had the

following severe impairments: degenerative joint disease of the bilateral knees with a history of

bilateral arthroscopy; degenerative disc disease of the lumbar spine; degenerative disc disease of

---

[11] The plaintiff's primary care provider was PriMed Medical Center ["PMC"], and his primary care physician was Dr. Arnold DoRosario. (*See* Tr. 1040–1118). Most of the plaintiff's records from PMC do not relate to his alleged disability, and those that do relate to his disability do not undermine the ALJ's decision. For instance, the plaintiff's PMC records from May 30, 2012 note a history of chronic back pain; however a review of the plaintiff's musculoskeletal system revealed no musculoskeletal symptoms; a neurological examination showed that his gait and stance were normal and that there were no sensory abnormalities. (Tr. 1060–61). On December 14, 2012, a musculoskeletal review revealed back pain, but there were "[n]o muscle aches, no soft tissue swelling, and no localized joint pain." (Tr. 1056). Also, there was no arthritis, deformity, tendonitis, or joint effusion noted. (Tr. 1057). The plaintiff did not have full range of motion in all of his finger joints, wrist joints, elbow joints, or shoulder joints; and the cervical spine, lumbar spine, hips, and knees did not show full range of motion. (Tr. 1057–58). A neurological examination revealed no sensory or coordination/cerebellum abnormalities and no muscle atrophy. (Tr. 1058). The plaintiff's muscle tone and motor strength were normal, as was his gait and stance. (Tr. 1058). On June 12, 2013, the plaintiff complained of, *inter alia*, bilateral elbow and knee pain, which became worse when he changed positions. (Tr. 1048). He reported no musculoskeletal symptoms, however, and his gait and stance were normal. (Tr. 1049).

[12] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding regarding the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo*, 142 F.3d at 79–80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

the cervical spine; and degenerative joint disease of the left shoulder.[13] (Tr. 27, citing 20 C.F.R. § 404.1520(c)). At step three, the ALJ concluded that, as of the date last insured, the plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 28, citing 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). At step four, the ALJ found that, as of the date last insured, the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that he was limited to only occasional climbing, stooping, kneeling, crouching, or crawling; to only frequent balancing; to work in a setting free of concentrated exposure to hazards such as machinery, heights, or the operation of motor vehicles; to only frequent use of his upper extremities for reaching, handling, fingering, or feeling; to work involving no overhead reaching; and to standing and/or walking for no more than four hours cumulatively during the course of an eight hour workday. (Tr. 29). The ALJ concluded that, as of the date last insured, the plaintiff was unable to perform any past relevant work (Tr. 34, citing 20 C.F.R. § 404.1565); however, after considering the plaintiff's age, education, work experience, and RFC, he concluded that jobs existed in significant numbers in the national economy that the plaintiff could perform. (Tr. 35, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)). Specifically, the ALJ found that the plaintiff could perform the jobs of parking lot attendant or cashier. (Tr. 36). Accordingly, the ALJ concluded that the plaintiff was not under a disability, as defined in the Social Security Act, at any time from the alleged onset date of November 1, 2008, through the date last insured of December 31, 2013. (Tr. 36, citing 20 C.F.R. § 404.1520(g)).

---

[13] Additionally, the ALJ noted the following other medically determinable impairments that manifested in the plaintiff *after* the date last insured: cubital tunnel syndrome; carpal tunnel syndrome; upper extremity entrapment neuropathy; and normocytic anemia. (Tr. 28).

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted).  Second, the court must decide whether substantial evidence supports the determination. *See id.*  The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted).    Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  *See id.*  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

## V.    DISCUSSION

Here, the plaintiff contends that the ALJ failed to afford proper weight to the credibility of his treating physicians, specifically Dr. Dawe and Dr. Walczyk.  (Pl.'s Mem. at 31–32).  The plaintiff further contends that the ALJ improperly found that his impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listing 1.02 or Listing 1.04.  (Pl.'s Mem. at 25–34).  Finally, the plaintiff argues that substantial evidence did not support the ALJ's determination that the plaintiff had the RFC to perform light work with the noted restrictions through the date last insured.  (Pl.'s Mem. at 33–34).[14]  In response, the defendant avers that (1) the ALJ properly weighed the medical evidence in the record; (2) the ALJ correctly determined that the plaintiff did not meet or medically equal Listing 1.02 or Listing 1.04; and (3) substantial evidence supported the ALJ's RFC determination. (Def.'s Mem. at 4–11).

### A.    THE ALJ PROPERLY APPLIED THE TREATING PHYSICIAN RULE

The plaintiff claims that the ALJ afforded improper weight to the opinions of his treating physicians, Dr. Dawe and Dr. Walczyk.[15]  (*See* Pl.'s Mem. at 31–33).  The plaintiff argues that (1)

---

[14] At the very start of his brief, the plaintiff listed the following issues in summary fashion: (1) the ALJ's conclusion that the plaintiff does not meet Listing 1.02 is contrary to the evidence in the record; (2) the ALJ's conclusion that the plaintiff does not meet Listing 1.04 is contrary to the evidence in the record; (3) the ALJ afforded improper weight to the opinions of the plaintiff's treating physicians; (4) the ALJ found incorrectly that the plaintiff had "relatively little treatment in 2009 or 2010"; (5) the ALJ stated wrongly that the plaintiff was "a person of lesser age" as of the date last insured; (6) the ALJ's conclusion that the plaintiff could engage in substantial gainful employment in a light duty capacity as of his date last insured is contrary to the evidence in the record; and (7) the ALJ failed to find that the plaintiff's impairments considered in combination equal Listing 1.02 and/or Listing 1.04.  (*See* Pl.'s Mem. at 22–24). But in his brief, the plaintiff fails to develop any argument whatsoever related to the ALJ's finding of "relatively little treatment in 2009 or 2010" and to the ALJ's alleged treatment of him as "a person of lesser age" as of the date last insured.  Accordingly, the plaintiff has waived these claims.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also Gaathje v. Colvin*, 2016 WL 11262524, at *5 (D. Conn. July 11, 2016).

[15] In addition to Dr. Dawe and Dr. Walczyk, the plaintiff has an extensive treatment history with Dr. Kirschenbaum; *see supra* part II.B.1; but there is no mention of Dr. Kirschenbaum in the ALJ's ruling.  An ALJ "need not recite every piece of evidence that contributed to the decision, so long as the record permits [the Court] to glean the rationale of an ALJ's decision." *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (per curiam). And the plaintiff does not claim that the ALJ erred in failing to discuss Dr. Kirschenbaum. The plaintiff also has an extensive treatment history

"Dr. Dawe is clearly qualified to speak of the opinion of [the plaintiff's] physical function and abilities and his thoughts on whether those restrictions would translate to an inability to perform duties that are commonly associated with mason work"; and (2) Dr. Walczyk "performed multiple assessments of lower extremities and reviewed diagnostic testing and to say this doctor's opinion should be afforded no weight is patently unfair." (Pl.'s Mem. at 32). The defendant insists that the plaintiff's arguments are "incorrect" and "misstate[] the controlling law." (Def.'s Mem. at 7; *see also id.* at 9).

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion."). In this case, the ALJ did just that.

---

with Dr. Rosenman. *See supra* part II.B.2. The ALJ properly afforded no weight to Dr. Rosenman's opinions, however, as Dr. Rosenman is a gynecologist and, therefore, evaluations of musculoskeletal impairments are well beyond his expertise. (*See* Tr. 32). Moreover, as with Dr. Kirschenbaum, the plaintiff does not claim that the ALJ erred in affording no weight to Dr. Rosenman's opinions.

As to Dr. Dawe, the ALJ found that the plaintiff's "degenerative joint disease of the bilateral knees with history of bilateral arthroscopy, degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, and degenerative joint disease of the left shoulder" were severe impairments. (Tr. 28). To reach this conclusion, it necessarily follows that the ALJ would have had to consider and accept the diagnoses and opinions of Dr. Dawe, whom the ALJ acknowledged was a treating medical source and a specialist. (Tr. 31). Indeed, it was Dr. Dawe who diagnosed the plaintiff with degenerative disc disease of the lumbar spine (Tr. 290, 348), and neuromotion segment failure at the L5-S1 level. (Tr. 297, 299, 308, 356, 369). In addition, Dr. Dawe's treatment notes reflect "radicular pain consistent with an L5 root level" (Tr. 290, 299, 308, 348, 349, 358, 369, 391), tenderness over the L4-5 and L5-S1 regions (Tr. 290, 297, 299, 308, 345, 348, 349, 356, 358, 369, 391), and pain with forward flexion and side bending (Tr. 297, 299, 345, 349, 356, 358, 391). Dr. Dawe's notes likewise indicate, however, that the plaintiff showed no signs of focal muscle wasting, atrophy, or weakness (Tr. 290, 348, 391), unremarkable sensory examination (Tr. 297, 345, 356), "full motor[,] tone, power, and strength about his lower extremities" (Tr. 308, 345, 358, 369, 391), and that the plaintiff was able to walk on his heels and toes. (Tr. 297, 299, 345, 356, 358).

The ALJ discredited Dr. Dawe's opinion "that the claimant cannot perform his past work as a mason," because that opinion "is not a 'medical opinion' within the meaning of our regulations, and is instead an administrative finding reserved to the Commissioner." (Tr. 31; citing Social Security Ruling 96–5p, 1996 WL 374183, at *2 (S.S.A. July 2, 1996)). The ALJ noted, however, that this opinion was "consistent with the testimony of the vocational expert . . . ." (Tr. 31). The ALJ concluded properly that Dr. Dawe's opinion was one reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1) (providing that the Commissioner is "responsible for making the

determination about whether [claimants] meet the statutory definition of disability. . . . A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [a claimant is] disabled."); *see also Salazar v. Barnhart*, 172 F. App'x 787, 789 (10th Cir. 2006) (stating that the ALJ was not required to give any special significance to the opinion of the claimant's treating physician on the ultimate issue of whether the claimant was disabled). Dr. Dawe's opinion regarding the plaintiff's ability to function as a mason concerns an ultimate issue because whether a claimant can perform past relevant work is the precise question asked at step three of the five-step evaluation process that the ALJ performs. *See* note 12, *supra*. Moreover, the fact that the ALJ did not credit Dr. Dawe's opinion about the plaintiff's inability to perform his past relevant work had no impact on his ultimate decision. The ALJ actually agreed with Dr. Dawe tha the plaintiff was unable to perform his past relevant work, as he found in the plaintiff's favor at step three of the analysis. In the end, however, the ALJ found, at step five, that the plaintiff had the RFC to perform alternate, gainful employment, so that he was not disabled. Accordingly, the ALJ properly granted only "partial weight" to the opinion of Dr. Dawe.

As to Dr. Walczyk, the ALJ did not give any weight to his opinions from February 11, 2011, November 13, 2013, February 21, 2014, or October 15, 2014.[16] (Tr. 32). The ALJ explained that he did not grant any weight to Dr. Walczyk's opinions, in part, because "Mr. Walczyk is a chiropractor, and, thus, he is not an 'acceptable medical source' within the meaning of our regulations." (Tr. 32).

---

[16] The ALJ did not give any weight to Dr. Walczyk's opinions from February 21, 2014 and October 15, 2014 because "these opinions reflect the [plaintiff's] condition after the date he was last insured for benefits." (Tr. 32). Because consideration of those two opinions would have no impact on whether the plaintiff was disabled between his alleged onset date of November 1, 2008 and his date last insured of December 31, 2013, the ALJ was correct to afford them no weight.

The ALJ stated correctly that a chiropractor is not an "acceptable medical source" as defined in the regulations. *See* 20 C.F.R. 404.1502(a); *see also Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995) ("[A] chiropractor's opinion is *not* a medical opinion. The regulations provide that 'Medical opinions are statements from physicians and psychologists or other *acceptable medical sources*' that reflect judgments about the nature and severity of [a claimant's] impairment(s). . ." (citing 20 C.F.R. § 404.1527(a)(2)) (emphasis original).). However, the Commissioner may use evidence from "other sources" to "show the severity of the individual's impairment(s) and how it affects the individual's ability to function." Social Security Ruling 06–3p, 2006 WL 2329939, at *2 (S.S.A. Aug. 6, 1006). "Other sources" includes, *inter alia*, "[m]edical sources who are not 'acceptable medical sources,' such as . . . chiropractors . . . ." *Id.* "Because the regulations do not classify chiropractors as either physicians or 'other acceptable medical sources,' chiropractors cannot provide *medical* opinions." *Diaz*, 59 F.3d at 313 (emphasis original); *see also Graham v. Apfel*, 102 F. Supp. 2d 72, 80 (D. Conn. 1999) ("a chiropractor cannot provide a medical opinion concerning disability.").

Another reason the ALJ provided for not giving any weight to Dr. Walczyk's opinions was that the limitations he set out were "not consistent with the treatment notes from other medical sources during the period at issue." (Tr. 32). Though the ALJ did not indicate where in the record there existed objective medical evidence that was inconsistent with Dr. Walczyk's opinions, there are indeed inconsistencies between Dr. Walczyk's findings and the objective findings of the plaintiff's other medical providers.

For example, in Dr. Walczyk's November 13, 2013 visit note, he made the following objective findings: the plaintiff had decreased range of motion in his cervical and lumbar regions and tenderness on palpation over areas in the cervical, thoracic, and lumbar spine, as well as over

the right hip; several muscles revealed moderate tenderness, active trigger points, palpable tight muscle bands, and hypertonia; and the plaintiff's gait was "antalgic." (Tr. 892–93). Dr. Walczyk noted the following about the plaintiff's activities of daily living: the plaintiff's sitting tolerance was limited, as he could sit for only fifteen to thirty minutes before needing to stand, walk, or lay down; reaching and grasping items overhead posed great difficulty; he experienced prohibitive difficulty with forceful activities with his arms; he experienced three to five hours of sleep disturbance each night; he had moderate pain most of the time; and the pain interfered with his recreational activities most of the time. (Tr. 895).

Treatment records from May and December 2012, and April and June 2013, when the plaintiff's primary care physicians evaluated him, reveal that the plaintiff complained of no generalized decrease in strength, reported no musculoskeletal symptoms, "no sensory exam abnormalities were noted" and his "[g]ait and stance were normal." (Tr. 1048–49, 1052–53, 1060–61). The only pain that the plaintiff complained of to his primary care providers was bilateral elbow and bilateral knee pain. (Tr. 1048). Although the records reflect a "past medical history" of "backache (chronic back pain)," there was no mention of any constant or severe neck, back, or hip pain that was occurring currently, nor did the plaintiff complain of pain interfering with his activities of daily living. (*See* Tr. 1048–49, 1052–53).

Dr. Walczyk's objective findings consistently indicate that the plaintiff had decreased range of motion in his cervical spine "due to pain and/or spasm," that examinations of various muscles in the neck revealed active trigger points, mild-to-moderate tenderness, and that there were palpable tight muscle bands. (*See, e.g.*, Tr. 524–26, 553–55, 589–91). These findings are only partially consistent with the examination notes from the physical therapists who examined the plaintiff at IMC and who regularly noted only active trigger points and/or palpable tight muscle

bands in the cervical, thoracic, lumbar, and occasionally, shoulder regions. (*See generally* Therapy Visit Notes, Tr. 433–877, 879–98). The physical therapy visit notes do not indicate that the plaintiff experienced a decreased range of motion in any region.

For example, on February 11, 2011,[17] Dr. Walczyk noted the following objective findings: abnormal posture in the cervical and thoracic regions; decreased range of motion in the cervical spine due to pain and/or spasm; tenderness on palpation over C1, C5, C6, and C7; moderate tenderness, moderate edema, palpable tight muscle bands, and active trigger points on examination of various muscles in the neck; tenderness on palpation over the T1–T5 area; moderate tenderness on examination of the rhomboid major muscles on both sides; tenderness on palpation over the L4, L5, right sacroiliac join, and bilateral paraspinous muscles; tenderness on palpation over the trochanteric bursa; capsular tightness; and mild tenderness, active trigger points, and palpable tight muscle bands on examination of the gluteus medius muscle. (Tr. 508–509). The physical therapist's notes from that same date, however, reveal only spasm and mild to moderate tenderness on examination of certain muscles in the neck, as well as spasm and moderate tenderness on examination of certain muscles in the thoracic spine. (Tr. 511). Moreover, the plaintiff underwent an x-ray on February 11, 2011, which revealed "mild degenerative change at the level of C5/6 and 6/7 with disc space loss. There [was] no definitive instability appreciated on flexion and extension views." (Tr. 469).

At times, the physical therapy visit notes also indicate different subjective complaints from those that Dr. Walczyk noted. For example, on September 12, 2012, the plaintiff complained to Dr. Walczyk of severe pain in his neck, pain in his thoracic region, severe pain in his lumbar

---

[17] The ALJ afforded no weight to Dr. Walczyk's opinions from this date because Dr. Walczyk performed this examination "at the request of the [plaintiff's] civil trial lawyer in connection with a possible lawsuit for injuries the [plaintiff] sustained in a motor vehicle accident." (Tr. 32).

region, severe pain in his left shoulder blade, severe pain in his right hip, severe pain in his gluteal region, and severe pain in his right knee. (Tr. 808–809). On that same day, however, he complained to the physical therapist of pain in his neck, pain in his shoulder, moderate pain in his left bicep region, pain in his left elbow, moderate pain in his left tricep region, and moderate pain in his left forearm. (Tr. 810–11). Additionally, on November 13, 2013, the plaintiff complained to Dr. Walczyk of severe pain in his neck, moderate pain in his thoracic region, severe pain in his lumbar region, moderate to severe pain in his left shoulder blade, and severe pain in his right hip. (Tr. 893–94). On that same day, however, he complained to the physical therapist of "pain and discomfort" in his "right lower neck" and lumbar region.[18] (Tr. 896). Accordingly, substantial evidence supports the ALJ's determination that Dr. Walczyk's opinions are "not consistent with treatment notes from other medical sources during the period at issue." (Tr. 32).

## B.   THE ALJ CORRECTLY FOUND THAT THE PLAINTIFF DID NOT MEET LISTINGS 1.02 AND/OR 1.04

The plaintiff's second claim is that the ALJ concluded erroneously that he did not meet the requirements of Listing 1.02 or Listing 1.04. The plaintiff argues that the substantial evidence in the record shows that he met or medically equaled Listing 1.02 and/or Listing 1.04. Listing 1.02 provides:

> *(Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate

---

[18] The transcript is replete with additional examples of where the subjective complaints noted by Dr. Walczyk are inconsistent with those noted by the physical therapists at IMC, and where Dr. Walczyk's objective findings are only partially consistent with those of the physical therapists. For instance, on May 12, 2010, Dr. Walczyk noted that examination of the thoracic region revealed "tenderness on palpation over the T11 and T12," mild tenderness and palpable tight muscle bands on examination of the thoracic paraspinal muscles, abnormal gait and antalgic lean on examination of the lumbar spine, passive range of motion restrictions in the lumbar spine, pain radiating from the lumbar spine to the "right front side thigh," and active trigger points and palpable tight muscle bands in the lumbar region. (Tr. 723). The physical therapist, however, noted only palpable tight muscle bands and tenderness on palpation in the lumbar spine. (Tr. 724; *see also, e.g.*, Tr. 749–51, 756–58, 762–64, 767–82).

medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knew, or ankle), resulting in an inability to ambulate effectively, as defined in 1.00B2b; or

> B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively as defined in 1.00B2c.

20 C.F.R. Part 404, Subpt. P, App'x 1, § 1.02.  Listing 1.04 provides:

> *Disorders of the spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord.  With:

> > A. Evidence of nerve root compression characterized by neuro-automatic distribution of pain, limitation of motor of the spine, motor loss (atrophy associated muscle weakness or muscle weakness) accompanied by sensory reflexes or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

> > B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by an appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; or

> > C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings of appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpt. P., App'x 1, § 1.04.

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id*.  "For a claimant to qualify for benefits by showing that his unlisted impairment, or

combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar impairment listed." *Id.* at 531 (emphasis original); *see also Claymore v. Astrue*, 519 F. App'x 36, 37 (2d Cir. 2013) ("a claimant 'must present medical findings equal in severity to all of the criteria for the most similar impairment.'").

There is substantial objective medical evidence in the record to support the ALJ's conclusion that the plaintiff does not meet Listing 1.02. Listing 1.02 requires, *inter alia*, "gross anatomical deformity." 20 C.F.R. Part 404, Subpt. P, App'x 1, § 1.02. The objective medical evidence establishes that the plaintiff did not suffer from a "gross anatomical deformity." For example, the plaintiff's primary care provider indicated that, following a musculoskeletal review on December 14, 2012, there was "no deformity noted." (Tr. 1057). Moreover, not one of the plaintiff's treatment providers ever indicated that the plaintiff suffered from any deformity in any joint. The plaintiff, therefore, did not meet all of the criteria required for Listing 1.02.

There is also substantial objective medical evidence in the record to support the ALJ's conclusion that the plaintiff does not meet Listing 1.04. For instance, Listing 1.04 requires evidence of nerve root compression, or spinal arachnoiditis, or lumbar spinal stenosis manifested by "chronic nonradicular pain and weakness . . . resulting in an inability to ambulate effectively . . . ." *See* 20 C.F.R. Part 404, Subpt. P, App'x 1, § 1.04(A). On January 2, 2013, the plaintiff underwent an electromyography test, which revealed "no consistent nerve deficit." (Tr. 820).[19] Additionally, Dr. Dawe noted multiple times that the plaintiff showed no focal muscle atrophy, wasting or weakness (Tr. 240, 348, 391), that the plaintiff displayed full motor, tone, and

---

[19] There is also objective medical evidence from after the plaintiff's date last insured that finds no nerve root compression. (*See* Tr. 1011, 1037–38).

power during sensory examinations (Tr. 308, 345, 358, 369, 391), and that sensory examinations of the plaintiff were unremarkable (Tr. 297, 348, 356). Moreover, there are no instances in the record where the plaintiff's treatment providers diagnose spinal arachnoiditis, and there are no indications in the record that the plaintiff ever displayed an "inability to ambulate effectively." Although Dr. Dawe opined that the plaintiff suffered from radicular pain (*see* Tr. 290, 299, 308, 348, 349, 358, 369, 391), Listing 1.04 requires the pain to be "nonradicular pain." The plaintiff thus did not meet the requirements of Listing 1.04. Accordingly, substantial evidence supports the ALJ's decision that the plaintiff does not meet either Listing 1.02 or Listing 1.04.[20]

## C. THE ALJ'S RFC DETERMINATION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

The plaintiff's final argument is that there is not substantial evidence in the record to support the ALJ's determination that the plaintiff had the RFC to perform light work through the date last insured. (Pl.'s Mem. at 33). Specifically, the plaintiff argues that "finding that Plaintiff could perform [light work], which require[s] sitting and/or standing for periods greater than one hour, is contrary to the medical evidence and opinions . . . and which opinions regarding such restrictions as assigned to Claimant were substantiated by physical exam and testing." (Pl.'s Mem. at 33). The defendant responds that the objective medical evidence in the record, along with the opinions of the DDS physicians and the vocational expert, provide substantial evidence to support the ALJ's RFC determination. (Def.'s Mem. at 9–10).

Residual functional capacity is defined as "the most [a claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1); *see also Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (2d Cir. 2015). The Commissioner assesses a claimant's residual functional capacity

---

[20] The DDS experts, Dr. Joseph Connolly, Jr. and Dr. Jeanne Kuslis, considered whether the plaintiff's impairments met or medically equaled Listing 1.02 or Listing 1.04, and concluded that they did not. (*See* Tr. 86–98, 100–12).

"based on all the relevant medical and other evidence" in the record, which includes the plaintiff's subjective complaints. 20 C.F.R. § 404.1545(a)(1); *see also Barry*, 606 F. App'x 622 n.1. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls." *Id.* "This court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry*, 606 F. App'x 622 n.1, *citing* 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Following the hearing, the ALJ found that the plaintiff had the RFC to perform light work subject to certain limitations. (Tr. 29). The ALJ found specifically that the plaintiff's impairments limit him as follows: "he can sit from 30 to 45 minutes but has to frequently shift positions; can stand for 20 to 30 minutes; can walk for 20 to 30 minutes; has difficulty reaching; and has difficulty manipulating objects with his hands." (Tr. 29). The ALJ concluded further that the plaintiff was limited to, *inter alia*, "only occasional climbing, stooping, kneeling, crouching, or crawling," to "only frequent use of his upper extremities for reaching, handling, handling, fingering, or feeling," and to "to work involving no overhead reaching." (Tr. 29).

These limitations are consistent with the substantial evidence in the record. For example, on August 27, 2010, the plaintiff indicated that he had "moderate difficulty" walking two blocks, and "quite a bit of difficulty" walking one mile, sitting for one hour, and standing for one hour. (Tr. 699). On September 13, 2013, the plaintiff indicated that "pain prevents him from sitting more than 1 hour," that he "cannot stand for longer than 1/2 hour without increasing pain," and that he "cannot walk more than 1/4 mile without increasing pain." (Tr. 879). At the hearing before

the ALJ, the plaintiff testified that, in the summer of 2013, he could sit for a half hour to forty-five minutes before he had to stand up, and that he could stand for twenty to thirty minutes before he had to stop standing. (*See* Tr. 56–57). In December 2013, the plaintiff indicated to Dr. Walczyk that he could "sit for only 15-30 minutes before needing to stand walk or lay down," and that "[r]eaching and grasping items overhead pose[d] great difficulty." (Tr. 1003). The limitations that the ALJ included, *i.e.* "standing and/or walking for no more than four hours cumulatively during the course of an eight-hour work day," are tailored to the plaintiff's own subjective assessments of what he was capable of doing during the period of alleged disability. (*See* Tr. 29, *see also, e.g.*, Tr. 56–57, 879).

Moreover, Dr. Dawe indicated multiple times that the plaintiff was able to walk on his heels and toes. (Tr. 297, 299, 345, 356, 358). On January 28, 2008, Dr. Kirschenbaum noted that the plaintiff's pain was "aggravated when he lies on his back and decreased by standing and walking." (Tr. 310). On September 18, 2008, Dr. Dawe found the plaintiff to have "pain with sitting for any period of time." (Tr. 299). An MRI from October 15, 2008 revealed that, at L5-S1, the plaintiff had "a diffuse disc bulge" and "disc desiccation changes," and that the plaintiff had "a broad-based lateral disc protrusion on the left"; however, "this [was] unchanged from the prior examination and [was] not causing significant canal stenosis."[21] (Tr. 467). Additionally, on April 12, 2012, the plaintiff's primary care provider noted that the plaintiff's gait and stance were normal, that "[n]o sensory abnormalities were noted," that there was no muscle atrophy, and that "muscle tone was normal and motor strength was normal." (Tr. 1058).[22] Accordingly, substantial

---

[21] The "prior examination" noted was an MRI from June 9, 2006. (*See* Tr. 467).

[22] In addition, the ALJ considered the opinions of Dr. Connolly and Dr. Kuslis. They both determined that the plaintiff was capable of sitting, standing, and/or walking for "about 6 hours in an 8-hour workday." (Tr. 94, 107). The ALJ explained that he afforded "less weight" to the RFC opinions of Dr. Connolly and Dr. Kuslis because the medical evidence contained in the current record "justifies a conclusion that the claimant's impairments are more severe than was concluded by the state examining and non-examining doctors." (Tr. 33).

evidence in the record, including the plaintiff's subjective complaints and hearing testimony, supports the ALJ's RFC determination.

VI.     <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 18) is *denied*, and the defendant's Motion to Affirm (Doc. No. 25) is *granted*.

Dated this 28th day of September, 2018 at New Haven, Connecticut.

<u>/s/ Robert M. Spector, USMJ</u>_____
Robert M. Spector
United States Magistrate Judge